CARMEN LUISA CARRÓN LAMOUTTE ET AL., demandantes y recurrentes, *v.* COMPAÑÍA DE TURISMO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO ET ALS., demandados y recurridos.

*Número:* RE-89-25      *Resuelto:* 2 de marzo de 1992

*Harry Anduze Montaño* y *Efraín Guzmán Mollet*, abogados de la recurrente; *Juan A. Correa Suárez* y *Pedro J. Salicrup*, abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

La señora Carrón Lamoutte recurre ante nos como consecuencia de la sentencia emitida por el Tribunal Superior que desestimó una demanda incoada contra la Compañía de Turismo de Puerto Rico por separarla de su posición como Directora de la Oficina de Estudios Económicos y Estadísticos por motivo de una incapacidad física. Aunque anteriormente nos hemos expresado sobre las salvaguardas procesales que protegen a un empleado público en una plaza de carrera cuando se le destituye de su posición, *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990), esta es la primera vez que adjudicamos una controversia relativa a la separación de un empleado público del servicio por una incapacidad física o mental.

Por entender que la Compañía de Turismo de Puerto Rico no cumplió con el debido proceso de ley al decretar su cesantía sin la celebración de una vista en una etapa significativa del procedimiento administrativo, revocamos.

## I

La Sra. Carmen Carrón Lamoutte, su esposo y la sociedad de bienes gananciales constituida por ellos, incoaron una demanda contra la Compañía de Turismo del Estado Libre Asociado de Puerto Rico (en adelante la Compañía de Turismo) y su Director Ejecutivo, Hon. Miguel A. Domenech. En la misma reclamaron compensación por los daños y perjuicios que sufrieron como consecuencia de la cesantía de la señora Carrón Lamoutte del servicio público de carrera, por motivo de una alegada incapacidad física. Simultáneamente, solicitaron su reposición inmediata a la dirección de la Oficina de Estudios Económicos y Estadísticos de la empresa gubernamental y el pago de todos los emolumentos dejados de percibir desde su cesantía.

Al momento de su cesantía, la señora Carrón Lamoutte era una empleada gerencial en un puesto de carrera con cinco (5) años de servicios en la Compañía de Turismo y

había trabajado en el Gobierno de Puerto Rico durante dieciocho (18) años. Cuando la cesantearon, la señora Carrón Lamoutte se encontraba disfrutando de una licencia sin sueldo por enfermedad que le había concedido la Compañía de Turismo por razón de estar convaleciendo, desde el 1ro de agosto de 1984, de una recidiva de una dolencia de la espalda conocida como un *esguince lumbosacral.* Mientras recibía tratamiento, la señora Carrón Lamoutte solicitó varias licencias sin sueldo que fueron concedidas por la Compañía de Turismo. El 22 de abril de 1985 solicitó una extensión de la licencia sin sueldo y acompañó una certificación médica de que continuaba bajo tratamiento y se esperaba que la dieran de alta para el 17 de julio de 1985. La señora Carrón Lamoutte estuvo bajo tratamiento en el Fondo del Seguro del Estado (en adelante el Fondo) hasta el 29 de enero de 1986, fecha en que finalmente fue dada de alta.

El 31 de mayo de 1985, el Director Ejecutivo le envió una carta certificada informándole que "estamos procediendo a cesantearle del puesto que ocupa efectivo de inmediato". Apéndice del alegato de los recurrentes, pág. 149. En su misiva adujo que "[a]ceptado por usted que se encuentra incapacitada para desempeñar el cargo y necesitando la Compañía dicha posición para un mejor funcionamiento", denegaba su solicitud de extensión de la licencia sin sueldo y, en su lugar, la separaba de su cargo. Íd.

Oportunamente, ella solicitó una reconsideración de la decisión del Director Ejecutivo e invocó su derecho a la reinstalación al amparo del Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 7. Tan pronto recibió la petición, el Director Ejecutivo ratificó su decisión y expuso que la Ley de Compensaciones por Accidentes del Trabajo no aplicaba al caso. Además, sostuvo que tanto el Reglamento de Personal de la Compañía de Turismo como la Ley de Personal del Servicio Público de Puerto Rico "establec[ieron] que se puede separar del servicio a cualquier empleado cuando se determine que dicho

empleado está físicamente incapa[c]itado para desempeñar los deberes de su puesto". Apéndice del alegato de los recurrentes, pág. 152. En ninguna etapa de esta decisión se le ofreció a la señora Carrón Lamoutte una oportunidad de ser oída, ni por escrito ni en vista informal o formal.

Denegada su solicitud de reconsideración, la señora Carrón Lamoutte y su esposo iniciaron ante el Tribunal Superior la acción que origina el recurso ante nos. En su demanda sostuvieron que la decisión del Director Ejecutivo se tomó sin una previa determinación médica de incapacidad física y sin proveerle a la señora Carrón Lamoutte una oportunidad de ser oída en una etapa significativa del procedimiento. Luego de varios incidentes procesales, el tribunal de instancia acogió una moción de sentencia sumaria de la Compañía de Turismo y desestimó la demanda. En su sentencia, el foro de instancia concluyó que una corporación pública puede decretar la cesantía por motivos de salud de un empleado de carrera sin la celebración de una vista. Fundamentó su decisión en que este tipo de cesantía no inhabilita al empleado para regresar al servicio público y no tiene una implicación que en el futuro cree un estigma sobre la persona.

Como consecuencia de esta sentencia, la señora Carrón Lamoutte recurre ante nos y sostiene que se cometió error al convalidar su cesantía mediante un procedimiento contrario al debido proceso de ley. El planteamiento medular ante nuestra consideración es si una corporación pública puede cesantear a un empleado que se ausenta por motivos de salud sin que tenga una oportunidad de ser oído en alguna etapa significativa del procedimiento. Oportunamente, expedimos el recurso.

## II

En su recurso, la peticionaria sostiene que ella era acreedora a una reinstalación en su empleo al amparo del Art. 5a de la Ley de Compensaciones por Accidentes del

Trabajo, *supra*. Esta disposición impone la obligación a los patronos, incluyendo a las agencias e instrumentalidades públicas, de reservar el trabajo a sus empleados por un (1) año a partir del día en que sufren un accidente del trabajo. Simultáneamente, la ley también obliga al patrono a reinstalar al trabajador que solicita su reposición después de haber sido dado de alta por el Fondo.

El propósito principal de esta disposición es evitar el despido sin justa causa de un obrero lesionado que se acoge a los beneficios de la Ley de Compensaciones por Accidentes del Trabajo. R.N. Delgado Zayas, *Apuntes para el estudio de la legislación protectora del trabajo*, San Juan, 1989, pág. 189. Así se garantiza que el trabajador que sufre un accidente o enfermedad ocupacional acuda al Fondo para el tratamiento médico correspondiente sin temor a ser despedido.

Sin embargo, la protección que provee la ley sólo dura un (1) año y el derecho a la reinstalación se activa únicamente si *dentro del término* de doce (12) meses desde el accidente del trabajo, el obrero es *dado de alta* y en el momento en que se hace el referido requerimiento el empleado está *física y mentalmente capacitado* para realizar las funciones de su empleo. 11 L.P.R.A. sec. 7.

De acuerdo con el esquema del Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, *supra*, una vez transcurre el período de un (1) año sin que el empleado haya reclamado su reinstalación, el patrono puede cesantearlo. Mediante la Ley Núm. 1 de 17 de julio de 1979, la Asamblea Legislativa autorizó a las agencias dentro del sistema a decretar la cesantía de aquellos empleados públicos que estuvieran inhabilitados por accidentes ocupacionales y bajo tratamiento por el Fondo por más de doce (12) meses. 3 L.P.R.A. sec. 1336(6)(c).

En el caso de autos, al momento de la cesantía la

señora Carrón Lamoutte estaba en período de recuperación y bajo tratamiento por el Fondo por una recidiva de un accidente anterior. Para propósitos de accidentes ocupacionales, el Fondo define una *recidiva* como una "reaparición o recaída, sin intervención de causa ajena alguna al accidente o enfermedad, de una condición debidamente compensada o relacionada luego de haber transcurrido un período de recuperación y dicha recaída requiere tratamiento médico adicional".[1] Reglamento sobre Derechos de Obreros y Empleados Núm. 3966, Fondo del Seguro del Estado, 9 de agosto de 1989, Sec. 4P. Véanse: *Ríos Rivera v. Comisión Industrial*, 108 D.P.R. 808 (1979); 11 R.&R. P.R. secs. 3-4.

■ De esta acepción se desprende que una recidiva no es un nuevo accidente del trabajo. Esencialmente, constituye una petición del obrero para tratamiento adicional por una recaída de un accidente ocupacional ocurrido anteriormente y del cual se recuperó. Si después de la recuperación el empleado sufre una recidiva, sin que ocurra un segundo accidente, la fecha del suceso original es la que debe considerarse para el cómputo de los doce (12) meses provistos por el Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, *supra.*[2]

---

[1] El *Diccionario de la Lengua Española* define una *recidiva* como la "[r]epetición de una enfermedad algún tiempo después de terminada la convalecencia". *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 1152.

[2] En sus interpretaciones sobre el alcance del Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 7, el Secretario del Trabajo y Recursos Humanos también ha concluido que "cuando un trabajador sufre un accidente y se incapacita, y después de recuperado vuelve a recaer sin que intervenga un segundo accidente, *la fecha original* es la que debe considerarse para el comienzo del transcurso del período del año a que se refiere el Artículo 5A de la ley". (Énfasis suplido.) Consulta Núm. 10766 de 6 de febrero de 1980, pág. 2. Recientemente el Secretario del Trabajo ratificó esta interpretación al concluir que "[l]as recidivas no interrumpen este término ya que [é]stas se refieren a recaídas en relación *con un mismo accidente*". (Énfasis suplido.) Opinión Núm. 90-5 de 9 de julio de 1990. Véanse, también: Consultas Núms. 10766 de 6 de febrero de 1980, 10995 de 13 de mayo de 1981 y 10920 de 25 de noviembre de 1980.

■ La recidiva es distinguible de un accidente intercurrente, *Admor., F.S.E. v. Comisión Industrial*, 100 D.P.R. 363, 365 (1972); *Vélez, Admor. v. Comisión Industrial*, 91 D.P.R. 480 (1964), y de un accidente que agrava una condición preexistente. 11 L.P.R.A. sec. 3. En estos casos, contrario a la recidiva, se considera que el obrero sufre *otro* accidente que lo inhabilita para trabajar y, por lo tanto, podría ser acreedor nuevamente a los beneficios del Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, *supra*.

En el presente caso, la señora Carrón Lamoutte estuvo bajo tratamiento por una recidiva desde el 1ro de agosto de 1984 hasta el 29 de enero de 1986. Esta recaída fue resultado de un accidente ocurrido en junio de 1973 mientras trabajaba en la Administración de Fomento Económico. Ella había recibido tratamiento por ese accidente entre junio de 1973 y el 22 de marzo de. 1975, o sea, un total de veinte (20) meses. Durante esa enfermedad tuvo que ausentarse de su trabajo y se acogió a los beneficios del Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, *supra*. Cuando fue dada de alta por el Fondo en marzo de 1975, se le determinó un diez por ciento (10%) de incapacidad en sus funciones fisiológicas generales. Fue reinstalada en su puesto en la Administración de Fomento Económico el 4 de noviembre de 1974.

· El 2 de junio de 1980, la peticionaria pasó a ser empleada de la Compañía de Turismo en el cargo de Directora de la División de Estadísticas. En agosto de 1984, solicitó una licencia sin sueldo basándose en que su condición de la espalda "se ha recrudecido notablemente". Apéndice del alegato de los recurrentes, pág. 39. Nuevamente acudió al Fondo para recibir tratamiento por la recidiva y allí ordenaron reposo absoluto por varias semanas.

■ No obstante, como ella en 1973 había agotado el término de un (1) año dispuesto por el Art. 5a de la Ley de

Compensaciones por Accidentes del Trabajo, *supra*, y no había sufrido un nuevo accidente o uno que agravara una condición preexistente, ella no tenía derecho a acogerse nuevamente a la protección del referido artículo. Por lo tanto, al amparo de la Sec. 4.6(6)(c) de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1336(6)(c), la Compañía de Turismo podía iniciar el procedimiento de cesantía ya que alegadamente la empleada se encontraba inhabilitada para trabajar como resultado de un accidente ocupacional y, además, estaba recibiendo tratamiento del Fondo. Sin embargo, procede que examinemos si la Compañía de Turismo podía cesantearla de manera sumaria por esta causal, sin ofrecerle antes una oportunidad de ser oída.

## III

Al evaluar la controversia de autos recordemos que la Compañía de Turismo es "una corporación pública e instrumentalidad gubernamental del Estado Libre Asociado", 23 L.P.R.A. sec. 671a, excluida del sistema de personal del servicio público. Sin embargo, en conformidad con la Sec. 10.6 de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1338(3) y (4), la Compañía de Turismo adoptó un reglamento de personal que extendió el principio de mérito a los empleados no cubiertos por convenio colectivo.

El Reglamento de Personal de la Compañía de Turismo de Puerto Rico establece dos (2) categorías de empleados y dispone un procedimiento para el reclutamiento, ascenso, destitución y cesantía según su capacidad y bajo el principio de mérito. Mediante este ordenamiento, los empleados de carrera adquirieron un reconocido interés propietario en la retención de su empleo. Una vez se le reconoció ese derecho, el Estado no puede privárselo sin

unas garantías procesales que cumplan con el debido proceso de ley. Recientemente, el Tribunal Supremo federal se pronunció sobre estos extremos:

> El punto es claro: la cláusula de debido proceso de ley dispone que ciertos derechos sustantivos —vida, libertad y propiedad— no pueden ser despojados excepto conforme a procedimientos constitucionalmente adecuados. Las categorías de sustancia y procedimiento son distintas. Si la regla fuese de otra forma, la cláusula se reduciría a una mera tautología. No puede definirse "propiedad" más allá de lo que puede definirse la vida o la libertad por los procedimientos provistos para su privación. El derecho a un debido proceso de ley "es conferido no por gracia legislativa, sino por una garantía constitucional. A pesar de que la legislatura puede optar por no conferir un interés propietario en el empleo [público], *no puede constitucionalmente autorizar la privación de ese interés, una vez conferido, sin las garantías procesales apropiadas*". (Traducción y énfasis nuestros.) *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985).

█ Bajo esta normativa, y considerando nuestros pronunciamientos en *Torres Solano v. P.R.T.C.*, supra, los empleados de carrera de la Compañía de Turismo están protegidos por la cláusula constitucional del debido proceso de ley.

█ Con el propósito de garantizar estos derechos a los empleados de carrera, la Compañía de Turismo aprobó un reglamento de personal en diciembre de 1972. Este reglamento estableció en su Sec. 112 un procedimiento para la resolución de querellas y apelaciones administrativas y creó un Comité de Evaluación de Querellas para resolver controversias surgidas por "destituciones, suspensiones temporeras, y descensos de empleados...". Reglamento de Personal, Compañía de Turismo de Puerto Rico, 27 de diciembre de 1972, Sec. 112, pág. 43.(³)

---

(³) El 15 de marzo de 1989 la Compañía de Turismo aprobó otro reglamento de personal aplicable a los empleados gerenciales que ocupen puestos de carrera. El reglamento crea un Comité de Apelaciones para atender y resolver las apelaciones de

No obstante, este procedimiento no incluía controversias originadas por casos de cesantía por incapacidad física o mental. Tampoco incluía cesantías cuando el empleado estuviese inhabilitado por accidente de trabajo y en tratamiento médico en el Fondo por un período mayor de doce (12) meses desde la fecha del accidente. 3 L.P.R.A. sec. 1336(6)(c). Por ende, en estos casos el Reglamento de Personal de la Compañía de Turismo de Puerto Rico Núm. 4142 de 15 de marzo de 1989 no requería que se celebrara una vista en etapa alguna del procedimiento de cesantía.

En su alegato, la Compañía de Turismo sostiene que en estos casos "no existe *imputación ni formulación de cargos* alguna a la recurrente por lo que haya que aplicar la doctrina de *Loudermill*". (Énfasis suplido.) Alegato de la parte recurrida, pág. 14. Fundamentado en esta premisa, la Compañía de Turismo aduce que no es necesaria una vista cuando se deja cesante a un empleado por incapacidad mental o física.

Su teoría presume que la cesantía por incapacidad física o mental por un accidente ocupacional o una enfermedad que no esté relacionada con el trabajo, no impide que el empleado vuelva a trabajar en el servicio público y, por lo tanto, no se crea un estigma que, al amparo de la doctrina de *Board of Regents v. Roth*, 408 U.S. 564 (1972), lo prive de su libertad. Esta teoría ignora que el Estado le confirió a los empleados de carrera de la Compañía de Turismo un interés propietario y es bajo el palio de la normativa de esta área que los peticionarios invocan su derecho a las garantías mínimas procesales reconocidas por el Tribunal

---

los empleados no cubiertos por convenios colectivos en casos de destitución, suspensión de empleo y sueldo, y cesantías por incapacidad física o mental. Reglamento de Personal de la Compañía de Turismo de Puerto Rico Núm. 4142, 15 de marzo de 1989, Sec. 13.5B. Este reglamento provee un procedimiento para una vista informal en los casos de suspensión de empleo y sueldo y destitución, pero no en las cesantías por incapacidad mental o física. Íd., Sec. 13.4C8(a). En cuanto a las cesantías por estar inhabilitado por accidente del trabajo y en tratamiento médico en el Fondo, el Reglamento no dispone para una vista informal o formal antes o después de la separación. Íd., Sec. 13.5C.

Supremo federal en *Cleveland Board of Education v. Loudermill*, supra. Sin embargo, en vista de que los empleados cubiertos por la reglamentación y legislación de personal de la Compañía de Turismo tienen una expectativa legítima de continuar en el empleo y recibir los salarios y beneficios fijados por ley, ellos tienen derecho a que no se les separe de sus puestos por incapacidad física o mental sin que se les ofrezca una oportunidad de ser oídos antes de su separación.

■ Como regla general, entre estas garantías mínimas de naturaleza constitucional insoslayable, los empleados de la Compañía de Turismo tienen derecho a ser notificados de la acción en su contra y sus efectos sobre su empleo. También tienen derecho a presentar su versión de los hechos en una vista informal. "La vista no debe ser compleja, complicada, extensa o formal. Basta con que se le permita al empleado explicar personalmente o por escrito las razones por las cuales, según él, no debe ser disciplinado así." (Énfasis suprimido.) *Torres Solano v. P.R.T.C.*, supra, pág. 527. Después de esa vista informal, si se determina que está inhabilitado para trabajar, la Compañía de Turismo podrá decretar su cesantía notificándole de su derecho a una vista posterior ante el Comité de Evaluación de Querellas.

## IV

De las conclusiones de hechos de la sentencia y de las comparecencias de las partes se desprende que la señora Carrón Lamoutte fue cesanteada de su empleo de carrera en la Compañía de Turismo el 31 de mayo de 1985. Para esta fecha, ya el Tribunal Supremo federal había establecido en *Cleveland Board of Education v. Loudermill*, supra, el contenido mínimo de las garantías del debido proceso de ley para empleados públicos en situaciones análogas.

Además, aunque la Ley de Personal del Servicio Público de Puerto Rico permite que se cesantee a un empleado público por incapacidad física o mental, se requiere que antes de separarlo por estas razones la autoridad nominadora haga la determinación de "que dicho empleado está física y/o mentalmente incapacitado para desempeñar los deberes de su puesto", 3 L.P.R.A. sec. 1336(6)(b), o "est[á] inhabilitado por accidente del trabajo" y en tratamiento médico por el Fondo por más de doce (12) meses, 3 L.P.R.A. sec. 1336(6)(c). Está implícito en estos preceptos que para que la decisión sea razonable y pueda ser revisada judicialmente ésta tiene que estar avalada por unas determinaciones sobre la incapacidad física o mental del empleado.

En su Sec. 4.6(6)(b), la Ley de Personal del Servicio Público de Puerto Rico autoriza a la autoridad nominadora a requerir un examen médico cuando tiene "base razonable para creer que un empleado está incapacitado …". 3 L.P.R.A. sec. 1336(6)(b). Para evitar que el empleado que se niegue a someterse a este examen médico requerido impida una decisión, la ley dispone que esta negativa "podrá servir de base a una presunción de incapacidad". Íd. Solamente cuando esto ocurre es que la ley permite que se cree una presunción de incapacidad. En todos los demás casos, la autoridad nominadora tiene que hacer una determinación de incapacidad a base de la prueba sometida.

Cuando el empleado haya sufrido un accidente ocupacional que le impida trabajar y esté bajo tratamiento médico del Fondo por más de doce (12) meses, también se requiere una determinación de que está inhabilitado para continuar desempeñando las funciones inherentes al puesto. Corresponde a la autoridad nominadora obtener la información médica correspondiente para demostrar su incapacidad para trabajar. Factores tales como el tipo de lesión sufrida, el grado de incapacidad resultante, el poten-

cial de recuperación del lesionado, las destrezas requeridas para el puesto, el tipo de tratamiento médico requerido y las necesidades de la agencia, entre otros, deberán ser considerados.

Este es precisamente el tipo de decisión que requiere unas conclusiones de hecho sobre las condiciones físicas y mentales de una persona que no deben ser formuladas sin que la parte afectada tenga una oportunidad de exponer su posición y rebatir cualquier prueba en su contra.

> Hechos vinculados a las partes y a sus negocios y actividades, o sea, hechos adjudicativos, son intrínsecamente la clase de hechos que ordinariamente no deben ser determinados sin darle a las partes una oportunidad de saber y conocer cualquier evidencia que les pueda ser desfavorable, esto es, sin proveerle a las partes una oportunidad para un juicio. La razón es que las partes saben más sobre los hechos que le conciernen a ellos y a sus actividades que cualquier otra persona, y por lo tanto las partes están en una posición especialmente buena de refutar o explicar la evidencia relacionada con hechos adjudicativos. Como con frecuencia las partes podrían tener poco o nada que contribuir al desarrollo de hechos legislativos, el método del juicio frecuentemente no es requerido para la determinación de las controversias disputadas sobre hechos legislativos. (Traducción nuestra.) 2 *Davis, Administrative Law Treatise* Sec. 12.3, pág. 413 (2da ed. 1979).

En el caso de autos, la Compañía de Turismo la nombró en su posición consciente de que ella tenía un diez porciento (10%) de incapacidad por el accidente original. Desde su nombramiento en el 1980, ella había cumplido con las responsabilidades de su puesto y no fue hasta el 1984 que tuvo una recaída que requirió un tratamiento mediante una licencia por enfermedad que fue aprobada por la Compañía de Turismo. Al amparo de la reglamentación vigente, ella solicitó varias extensiones de su licencia y la Compañía de Turismo las aprobó sin condiciones *ni un apercibimiento de que no serían extendidas.*

En abril de 1985, conforme al procedimiento establecido por la Compañía de Turismo, ella solicitó otra extensión de su licencia y remitió la certificación médica requerida para acreditar su tratamiento. Al igual que en las otras ocasiones, la certificación informó que su condición requería un tratamiento adicional y que se esperaba la reinstalación en su posición en julio de 1985. De los autos se desprende que ninguna de las certificaciones incluía un informe de su condición física o de su incapacidad. Por otro lado, en ningún momento la Compañía de Turismo requirió que ella se sometiera a un examen médico y no hay prueba de que la decisión del Director Ejecutivo estuviera fundamentada en algún informe sobre la condición física de la peticionaria, que demostrara que al concluir la licencia por enfermedad ella no podía continuar desempeñando las funciones de su puesto. Tampoco se demostró que ella usó indebidamente la licencia sin sueldo por enfermedad o que por razones de los servicios ofrecidos por la instrumentalidad era necesario cubrir inmediatamente su puesto con otro nombramiento de carrera. Además, no existe base estatutaria para concluir que la certificación que acreditaba su enfermedad y su tratamiento por el Fondo dieran lugar a una presunción de incapacidad. No obstante, aún en ese caso, ella tendría derecho a una oportunidad para controvertir la presunción.

En estas circunstancias, ella era acreedora a que, antes de la decisión de la Compañía de Turismo, se le ofreciera una oportunidad de ser oída en una vista informal. Una vez se decretara su separación por incapacidad física o mental, tenía derecho a solicitar una vista adicional que cumpliera con el debido proceso. Como la Sec. 112 del Reglamento de Personal de la Compañía de Turismo, *supra*, no ofrece estas garantías a los empleados de carrera separados por incapacidad física o mental, sus disposiciones

violan el debido proceso de ley y, por ende, son inconstitucionales.

Como en el caso de autos la Compañía de Turismo no cumplió con estas garantías procesales, *procede la revocación de la sentencia recurrida y en su lugar se ordena la reposición de la señora Carrón Lamoutte con el pago de los haberes y sueldos que efectivamente dejó de percibir.* Véase *Estrella v. Mun. de Luquillo, 113 D.P.R. 617, 619 (1982). Su reinstalación se retrotrae a la fecha en que el Fondo la dio de alta y le autorizó que ella regresara a su trabajo. Esta decisión es sin menoscabo de que la Compañía de Turismo pueda, de estimarlo procedente, iniciar un nuevo procedimiento de separación por incapacidad que cumpla con las normas establecidas en Torres Solano v. P.R.T.C., supra.*

El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Rebollo López. La Juez Asociada Señora Naveira de Rodón se inhibió.

— O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Rebollo López.

I

"*Torcedura o esguince* se define como '... distensión violenta de una articulación, sin luxación, que puede llegar a la rotura de algún ligamento o de fibras musculares próximas. *Se caracteriza por dolor, tumefacción rápida e incapacidad para los movimientos.' Diccionario Terminológico de Ciencias Médicas*, Capdevila, 4ta. edición, 1952, Ed. Salvat. ... *Torcedura lumbosacral* comprende 'la dislocación entre la quinta vértebra lumbar y el sacro. La causa

usual es haber realizado fuerza con la parte baja de la espalda. *Se revela por dolor (especialmente al moverse), sensibilidad, espasmos musculares y limitación de movimientos.* Tiene tendencia a recurrir.' [Schmidt's *Attorneys' Dictionary of Medicine*, Vol. 1, 1977. Matthew Bender.] (Traducción nuestra.)." (Énfasis suplido y en el original.) *Canales Velázquez v. Rosario Quiles*, 107 D.P.R. 757, 761 escs. 2 y 4 (1978). Frente a esta realidad rehusamos descargar nuestra función judicial mecánicamente, invocando normas en abstracto.

Los términos genéricos de la sentencia no nos permiten precisar la razón de decidir (*ratio decidendi*) mayoritaria. Sí sabemos que este caso dista mucho de presentar, al decir de la opinión mayoritaria del Juez Asociado Señor Hernández Denton, el "planteamiento medular ...[de] si una corporación pública puede cesantear a un empleado que se ausenta por motivos de salud sin que tenga una oportunidad de ser oído en alguna etapa significativa del procedimiento". Opinión mayoritaria, pág. 77. Veremos que gira en torno a si esa autoridad nominadora —que liberal y discrecionalmente, durante más de nueve (9) meses, ha concedido vacaciones *sin sueldo* por enfermedad incapacitante— puede en algún momento negarse a continuar concediéndolas y, a la luz de las comunicaciones previas y la prueba médica del propio empleado, cesantearlo y decretar vacante el puesto.

Implícitamente la opinión del Tribunal conlleva la determinación correcta de que la Sra. Carmen L. Carrón Lamoutte ya había consumado el derecho a que durante su enfermedad ocupacional se le reservase su empleo por un (1) año bajo el Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 7. Sin embargo, ilógicamente, el resultado es que resuelven que la autoridad nominadora no podía utilizar sus propios certificados médicos —expositivos de su condición incapacitante— para adoptar la decisión de cesantearla.

Revisitemos los hechos.

## II

La señora Carrón Lamoutte trabajó en la Administración de Fomento Económico. El 5 de junio de 1973 sufrió un accidente laboral que le causó una dolencia en la espalda conocida como *esguince lumbosacral*. Se acogió a los beneficios del Fondo del Seguro del Estado (en adelante el Fondo), recibió tratamiento entre junio de 1973 y el 22 de marzo de 1975, y se le adjudicó un diez por ciento (10%) de incapacidad, posteriormente aumentado en recidiva al quince por ciento (15%). *En dicha ocasión reclamó con éxito y agotó el derecho a que se le reservase el empleo durante un (1) año según visualizado en el referido Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo.*

El 2 de junio de 1980 comenzó en la Compañía de Turismo; en diciembre adquirió *status* de empleada regular. Allí prestó eficientemente sus servicios. Sin embargo, estuvo ausente ciento cuatro (104) días con cargo a licencia regular y noventa y seis (96) días con cargo a licencia por enfermedad. *Agotó así esas licencias.* El 8 de agosto de 1984 escribió a la entonces Directora Ejecutiva comunicándole que su médico, el cirujano ortopeda Dr. Juan J. Feliú Reyes, le había informado que tenía la *necesidad de permanecer* en ABSOLUTO REPOSO, debido a un RECRUDECIMIENTO de la condición de *esguince lumbosacral* resultante del accidente sufrido en 1973. Por esa razón, en seis (6) distintas ocasiones solicitó por escrito que se le extendieran licencias sin sueldo por enfermedad. Sus solicitudes fueron acompañadas por certificados médicos que, según sus propias palabras, "explica[ban su] condición física actual". Apéndice del alegato de los recurrentes, pág. 39. Todas les fueron concedidas. Como resultado, la señora Carrón Lamoutte disfrutó CONSECUTIVAMENTE de una

*licencia sin sueldo* desde el 16 de agosto de 1984 hasta el 23 de abril de 1985.

Ante esta grave situación de ausencias, mediante carta fechada el 25 de enero de 1985, en ocasión de extenderle la licencia sin sueldo hasta el 4 de marzo de 1985, *la compañía de Turismo le notificó que era "la última a concederse".* (Énfasis suplido.) Apéndice del alegato de los recurrentes, pág. 45. No obstante, Carrón Lamoutte solicitó dos (2) extensiones adicionales: la primera hasta el 23 de abril y la segunda hasta el 17 de julio de 1985. *En ambas reiteró la necesidad de continuar permaneciendo en descanso y acompañó certificados médicos a tales efectos.* Por vía de paréntesis, cabe señalar que estuvo en tratamiento hasta el 29 de enero de 1986 —fecha en que el Fondo la dio de alta— por un total de *diecisiete* (17) *meses.*

El 31 de mayo, el Director de la Compañía de Turismo, Miguel A. Domenech, le notificó por escrito —a la luz de su solicitud de extender la licencia por enfermedad desde el 22 de abril hasta el *17* de julio de 1985— su decisión de cesantearla por razón de ella haber aceptado encontrarse incapacitada para desempeñar el cargo. Fue informada que, debido al prolongado período que llevaba disfrutando de una licencia sin sueldo por enfermedad, la Compañía de Turismo necesitaba "dicha posición para un mejor funcionamiento ...". Apéndice del alegato de los recurrentes, pág. 149.

El 15 de julio, su abogado Harry Anduze Montaño le pidió al Director Ejecutivo, el señor Domenech, la reconsideración. Adujo que la decisión era ilegal, pues la señora Carrón Lamoutte estaba bajo tratamiento del Fondo desde el 27 de septiembre de 1984. Aludió a los trabajos, esfuerzos y logros de la señora Carrón Lamoutte. Finalmente, le pidió una "oportunidad de poder dialogar" sobre el asunto. Apéndice del alegato de los recurrentes, pág. 151. Al otro día, el Director Ejecutivo, el señor Domenech, le contestó e informó que antes de cesantear a la

señora Carrón Lamoutte habían evaluado su caso. A juicio suyo, no venían obligados legalmente a reservarle su empleo. Al reiterar su determinación, indicó:

> Como Director Ejecutivo de la Compañía de Turismo es mi deber velar por una sana administración pública. *La Compañía ha estado casi por un año sin un Director de la División de Estudios Económicos y Estadísticas*, plaza muy necesaria para el buen funcionamiento de la misma. *La señora Carrón reconoce que está físicamente incapacitada para realizar su labor.* A esos efectos procedimos a utilizar los mecanismos brindados por la propia ley para solucionar esta situación. (Énfasis suplido.) Apéndice del alegato de los recurrentes, pág. 153.

Inconforme, el 15 de abril de 1986 la señora Carrón Lamoutte, su esposo, el Sr. Juan C. Ortiz, y la sociedad legal de gananciales demandaron a la Compañía de Turismo y a su Director Ejecutivo, el señor Domenech, en el Tribunal Superior, Sala de San Juan. En síntesis, alegaron que el despido sumario, sin la celebración de una vista, constituyó una privación de propiedad sin el debido proceso de ley, vedada por la Sec. 7 de la Carta de Derechos del Art. II de nuestra Constitución, L.P.R.A., Tomo 1. Solicitaron su reposición, el pago de salarios dejados de recibir y una compensación por daños y perjuicios.

Mediante sentencia sumaria emitida el 20 de septiembre de 1988, el tribunal de instancia (Hon. Nellie Ortiz Torres, Juez) declaró *sin lugar* la demanda.

### III

Hemos visto que la señora Carrón Lamoutte no podía en recidiva reclamar que se le reservase su empleo bajo el Art. 5a de la Ley de Compensaciones por Accidentes del Trabajo, *supra*. El Reglamento de Personal de la Compañía de Turismo disponía que la cesantía procedía "cuando es *evidente* que el empleado está incapacitado física o mentalmente para desempeñar el puesto". (Énfasis suplido.) Re-

glamento de Personal, Compañía de Turismo de Puerto Rico, 27 de diciembre de 1972, Sec. 111D, pág. 40. Igualmente así lo permite la Ley de Personal del Servicio Público, a saber, "cuando el empleado esté inhabilitado por accidente del trabajo y en tratamiento médico en el Fondo del Seguro del Estado por un período mayor de doce (12) meses desde la fecha del accidente, conforme a la sec. 7 del Título 11". 3 L.P.R.A. sec. 1336(6)(c).

Según expusiéramos en nuestro disenso en *Torres Solano v. P.R. Tel. Co.*, 129 D.P.R. 202, 210–211 (1991) — en reconsideración— la norma general establecida en *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), es que un empleado de carrera tiene derecho a una vista con anterioridad a ser separado de su puesto:

> En síntesis, *Cleveland Board of Education v. Loudermill*, supra, exige que antes del despido del empleado la autoridad nominadora debe notificarle los cargos en su contra y la intención de despedirlo, y concederle la oportunidad de una vista informal para que *presente su versión de los hechos (an opportunity to present his side of the story)*. De ninguna manera tiene que ser una vista formal y elaborada. La formalidad y los requisitos procesales de la vista dependerán de la importancia de los intereses en juego y de la naturaleza de los procedimientos ulteriores. No tiene que ser una vista evidenciaria completa (*full evidenciary hearing*), sino *algo menor (something less)*. Tampoco tiene que resolver definitivamente la propiedad del despido, sino más bien *servir como un cotejo inicial que evita la toma de decisiones erróneas o determinación de base razonable de veracidad de los cargos que sostendrán el despido*. Después de esa vista informal podrá decretarse el despido, sujeto siempre a la celebración de una vista formal posterior que cumpla con todos los requisitos del debido proceso de ley.
>
> El carácter informal de la vista previa al despido persigue establecer un justo balance entre el interés del empleado en la retención de su puesto y el interés del Estado en que el despido se efectúe rápidamente cuando sea meritorio. Véanse: L.B. Howard, *Cleveland Board of Education v. Loudermill: Procedural Due Process Protection for Public Employees*, 47 Ohio St. L.J. 1115 (1986); K.M. Murchison, *Local Government Law*, 48 La. L. Rev. 303 (1987). (Énfasis en el original suprimido y énfasis suplido.)

Sin embargo, allí también reconocimos la existencia de *excepciones*. Igual lo hizo la opinión mayoritaria en *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499, 524 (1990): "no es necesario la celebración de una vista previa al despido en *todos los casos*". (Énfasis suplido.) Por lo tanto, debemos analizar los criterios establecidos en *Cleveland Board of Education v. Loudermill*, supra, y acogidos por la mayoría y nuestra opinión disidente, en reconsideración, en *Torres Solano v. P.R. Tel. Co.*, supra, para determinar si en el presente caso se cumplieron con los principios del debido proceso de ley.

En el caso de autos, la autoridad nominadora no podía celebrar una vista inicial en el sentido *clásico*, a la cual pudiera asistir y estar presente la señora Carrón Lamoutte. Conforme su propia solicitud, avalada en numerosos certificados médicos, su estado de salud no se lo permitía. Ella necesitaba reposo *absoluto, debido a una condición que se caracteriza por dolor al moverse y que limita los movimientos*. Ello fue corroborado cuando para el 15 de julio su abogado Anduze Montaño, al solicitar reconsideración al Director Ejecutivo, el señor Domenech, pidió una entrevista para él. No reclamó vista para ella, lo cual es perfectamente comprensible frente a la realidad de que continuaba con su dolencia incapacitante y bajo tratamiento con el Fondo. La prueba revela que no fue hasta OCHO (8) MESES DESPUÉS, el 29 de enero de 1986, que fue dada de alta. ¿Había que esperar ese tiempo adicional?

Ante las serias dolencias, requerir la presencia de la señora Carrón Lamoutte hubiese sido un absurdo y un esfuerzo vano. Las comunicaciones escritas entre su representante legal y el Director Ejecutivo, el señor Domenech, por *equivalencia*, constituyeron suficiente debido proceso de ley. Como afirma Davis, "[o]riginalmente el término 'vista' se refería sólo a un proceso oral, basado en que el personal de una agencia únicamente podía 'escuchar' con sus oídos —no pudiendo 'escuchar' palabras escritas. Pero desde 1972, una 'vista' puede celebrarse *completamente por*

*escrito* porque el Tribunal Supremo federal decidió en el 1972 que el procedimiento de *comunicación y comentarios escritos* ('notice and written coments') satisfizo un requisito estatutario de celebración de 'vista' ". (Traducción y énfasis nuestros.) 2 *Davis, Administrative Law Treatise* Sec. 12.10, pág. 448 (2da ed. 1979). Esta posición es acogida por otros reputados estudiosos. Friendly nos dice que "[a] pesar de que el término 'vista' goza de una connotación oral, no hay razón alguna por la cual bajo ciertas circunstancias una 'vista' no pueda celebrarse totalmente por escrito". (Traducción nuestra.) H.J. Friendly, *Some Kind of Hearing*, 123 (Núm. 6) U. of Pa. L. Rev. 1267, 1270 (1975). El término *vista*, "en su significado más amplio aplica a todo, desde la presentación oral o escrita de argumentos por una parte hasta la celebración de una vista cuasi judicial en que la parte tenga derecho a contrainterrogar testigos y obtener una decisión en el récord [(*on the record*)]". (Traducción nuestra.) 4 *Administrative Law* Parte VII, Sec. 31.02[1] (1991).

Aclarado este extremo, veamos los intereses afectados por la acción oficial. Es obvio que el de mayor importancia e impacto sería que la señora Carrón Lamoutte hubiese sido privada de su fuente de ingresos. Ciertamente, el ingreso es un interés substancial. No obstante, resulta innegable que quedó aminorado —por no decir inexistente— ante la realidad de que la señora Carrón Lamoutte llevaba alrededor de nueve (9) meses y medio *sin recibir salario*. Por otra parte, su capacidad potencial para ser reempleada no se afectó adversamente. Aquí estamos ante una cesantía en lugar de una destitución disciplinaria.(¹) La diferen-

---

(¹) Conforme al Reglamento de Personal de la Compañía de Turismo, *cesantía* "[s]ignifica la separación de un empleado debido a falta de trabajo, a falta de fondos, *a incapacidad física o mental*, o ineptitud para desempeñar el puesto que ocupa y cualquier otra causa que no sea constitutiva de una destitución"; y *destitución* "[s]ignifica la *separación definitiva* de un empleado por causa justificada según los procedimientos establecidos por la Compañía". (Énfasis suplido.) Reglamento de Per-

cia es crucial: una vez cesara la incapacidad, la señora Carrón Lamoutte era elegible para ser empleada nuevamente en cualquier instrumentalidad pública. 3 L.P.R.A. sec. 1358(2).

Un *segundo* criterio —"el riesgo de [que] una determinación errónea ... prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas", *Torres Solano v. P.R. Tel. Co.*, supra, pág. 209— demuestra la *futilidad* de haber celebrado una vista precesantía. Si su propósito principal es evitar o reducir la posibilidad de una determinación errónea, en las circunstancias de autos, también dicha posibilidad era inexistente debido a que la cesantía se fundamentó en unos hechos sobre los *cuales no existía controversia*: la incapacidad resultante de una *dolencia esquince lumbosacral.*

En *Cleveland Board of Education v. Loudermill*, supra, pág. 544, el Tribunal Supremo de Estados Unidos enfatizó que allí el despido implicaba asuntos controversiales (*arguable issues*); no se fundamentó, como en el de autos, en un hecho *objetivo.* Bajo aquellos asuntos controvertibles, la probabilidad de una determinación errónea fue mucho mayor.

## IV

La opinión mayoritaria malinterpreta los hechos y se sostiene en unas premisas erróneas. Nos dice que en todas estas certificaciones se informaba una fecha *tentativa* de recuperación. "... [N]inguna de las certificaciones incluía un informe de su condición física o de su incapacidad." Opinión mayoritaria, pág. 87. A renglón seguido, expone que "no hay prueba de que la decisión del Director Ejecutivo

---

sonal, Compañía de Turismo de Puerto Rico, 27 de diciembre de 1972, Sec. 101, pág. 6.

estuviera fundamentada en algún informe sobre la condición física de la peticionaria, que demostrara que ... ella no podía continuar desempeñando las funciones de su puesto". Íd. En primer lugar, es ingenuo atribuirle valor adjudicativo al dato de que las certificaciones informaban unas fechas tentativas de recuperación. Observamos que las mismas respondían a unos ciclos y a un patrón repetitivo cada tres (3) meses. ¿Es que estas fechas *tentativas* de recuperación obligaban a la Compañía de Turismo a conceder las licencias? Curiosamente ninguna se aproximó a la realidad.

Afirma, además, que las extensiones de licencia sin sueldo fueron concedidas sin ningún tipo de "condici[ón] ni un apercibimiento de que [las mismas] no serían extendidas". (Énfasis suprimido.) Opinión mayoritaria, pág. 86. ¿Cómo puede hacerse caso omiso a que desde el 25 de enero de 1985 se le había notificado que era *LA ÚLTIMA?*

La incapacidad considerada en la ley y el citado Reglamento de Personal es la condición física o mental que impida a un empleado desempeñar a cabalidad las exigencias de su empleo. No se refiere a determinados por cientos de incapacidad ni a funciones físicas y/o mentales específicas. *Ríos Rivera v. Comisión Industrial*, 108 D.P.R. 808 (1979); *Sifontes v. Oliver Exterminating Services*, 128 D.P.R. 207 (1991). En el caso de autos, por aproximadamente nueve (9) meses, la señora Carrón Lamoutte constantemente sometió certificados médicos acreditativos de que *necesitaba permanecer en absoluto reposo*. Presentó, además, una determinación del Fondo a los mismos efectos. ¿Cómo puede la mayoría, de un plumazo, ignorarlos y descartar su valor probatorio?

Dichos certificados constituyeron evidencia suficiente para avalar la conclusión de que indudablemente la señora Carrón Lamoutte estaba incapacitada *a los fines* de la Ley de Personal y el Reglamento. *Permanecer consecutivamente en absoluto descanso por un total de diecisiete (17)*

*meses es incompatible con asistir y desempeñarse como Directora de la Oficina de Estudios Económicos y Estadísticas.*

La confusión de la opinión del Tribunal va más allá: concluye que el patrono viene obligado a presentar exámenes médicos sobre incapacidad en *todos* los casos. El razonamiento es erróneo, predicado en la premisa de que la presunción de incapacidad sólo surge cuando el patrono le requiere al empleado que se someta a exámenes médicos y éste se niega. Nada más lejos de la verdad. Salvo que se active la presunción, el patrono lleva el peso de la prueba en cuanto a la incapacidad. Sin embargo, éste puede probarlo de los documentos oficiales, incluso, como en el presente caso, por la evidencia sometida por la propia señora Carrón Lamoutte. Entonces, ¿qué necesidad había de evidencia médica *adicional?* Finalmente, confesamos que no alcanzamos a comprender la lógica del aserto de que los exámenes médicos eran imprescindibles para que la decisión administrativa pudiera ser revisada judicialmente. Opinión mayoritaria, pág. 85.

Ciertamente, aparte de la realidad de que era imposible que la señora Carrón Lamoutte estuviera presente en una vista precesantía, aquí no hubiese servido ningún propósito. *Su incapacidad no estaba en entredicho.* Indirectamente, la propia mayoría lo reconoce: reinstala a la señora Carrón Lamoutte "a la fecha en que el Fondo la dio de alta y le autorizó que ella regresara a su trabajo [(29 de enero de 1986)]". (Énfasis suprimido.) Opinión mayoritaria, pág. 88. ESTE MANDATO ES INCREÍBLE. Aun cuando aceptan que estuvo diecisiete (17) meses incapacitada, le exigen a la Compañía de Turismo el *absurdo* de que demuestre la *veracidad* de la evidencia que fue sometida por la *propia* empleada. El razonamiento implícito es que la Compañía de Turismo venía *obligado* a cuestionar los certificados médicos en que la señora Carrón Lamoutte apoyó su reclamo. Rechazamos semejante autoinflicción.

Nos negamos a permitir que una empleada que durante muchos meses se acogió a los beneficios de una licencia *sin sueldo,* fundamentándose en la necesidad de permanecer en absoluto descanso debido a la delicada condición de *esguince lumbosacral,* se contradiga alegando que no se encontraba incapacitada para trabajar.

En *resumen,* el precepto de la Ley de Personal de que procede una cesantía si un empleado que recibe tratamiento médico se ausenta por un período mayor de doce (12) meses, según expuesto, eximía a la Compañía de Turismo de reservarle el empleo a la señora Carrón Lamoutte. Como la ausencia por un período de tiempo en exceso nunca estuvo en controversia y su condición era de cuidado, la vista precesantía no hubiese servido ningún propósito. Máxime ante la imposibilidad física de ella estar presente.

El interés perseguido en toda acción sumaria es la economía en términos de tiempo y recursos. En las presentes circunstancias, exigir una vista anterior y otra posterior a la cesantía es imponer un gasto innecesario al erario. Resulta aún más oneroso si recordamos que la Compañía de Turismo se vio privada aproximadamentepor nueve (9) meses —sin contar los períodos previos de ausencia por vacaciones y enfermedad— de los servicios de la Directora de la Oficina de Estudios Económicos y Estadísticos.

Si algo revela dramáticamente este caso es una agencia gubernamental que, como patrono, ha sido más que liberal, cooperadora y comprensiva. La sentencia mayoritaria es abusiva; *innecesariamente,* al costo operacional ya sufrido por la agencia, le suma los de una reinstalación y celebración de una vista posterior. Según la sentencia mayoritaria, la Compañía de Turismo tendrá que pagarle íntegramente a la señora Carrón Lamoutte su sueldo por los *últimos* seis (6) años.

Nos da la sensación de que la opinión mayoritaria ha

olvidado que el "debido proceso de ley ofrece protección contra la arbitrariedad administrativa, pero en modo alguno es 'molde rígido que prive de flexibilidad' a los organismos administrativos". *Henríquez Soto v. Consejo de Educación Superior*, 120 D.P.R. 194, 201–202 (1987). Más que en hechos, es producto de una FICCIÓN JUDICIAL.