El Juez Asociado Señor Rivera Pérez
emitió la opinión del Tribunal.
El caso de autos nos brinda la oportunidad de resolver si en la destitución de la Directora de la División de Préstamos Especiales y Recobros del Banco de Desarrollo Económico para Puerto Rico medió justa causa. El Banco la destituyó por incumplirle el pago de un préstamo, cuya deuda ascendía a poco menos de medio millón de dólares —en su capacidad de garantizadora personal y solidaria— e incurrir en conflicto de interés y deslealtad hacia la institución. Veamos los hechos que originan el recurso.
I
En 1995, Hecson de Puerto Rico, Inc. (Hecson), corporación dedicada a la importación, la venta, la distribución y el procesamiento de jugos, purés, pulpas y concentrados de fruta, atravesaba por una situación económica precaria. *5 Buscando conjurarla, solicitó un préstamo al Banco de Desarrollo Económico para Puerto Rico (Banco) por la cantidad de $500,000. La Leda. Sonia M. Vázquez Cintrón (licenciada Vázquez), en unión a su esposo, Sr. Héctor L. Andújar Ruiz (señor Andújar Ruiz), figuraban como incorporadores, y Secretaria y Presidente, respectivamente, de la referida corporación. El 27 de junio de 1995, el Comité de Crédito del Banco denegó la solicitud de préstamo porque Hecson no reflejaba habilidad de pago y su estructura de capital mostraba un alto grado de endeudamiento e insolvencia.
El 1 de septiembre de 1995 Hecson solicitó del Banco una reconsideración a la denegatoria de financiamiento empresarial, reduciendo su solicitud de préstamo a $300,000. El 1 de noviembre de 1995, el Comité de Crédito del Banco denegó nuevamente la solicitud, esencialmente, por las mismas razones en que descansó su denegatoria inicial.
Entre tanto, el 5 de septiembre de 1995, la licenciada Vázquez había sido contratada por el Banco para que se desempeñara como Líder de Grupo de Asuntos Legales, puesto incluido en su servicio de carrera, con un sueldo asignado de sobre $44,000 anuales.(1)
El 4 de enero de 1996, Hecson presentó en el Banco otra solicitud de reconsideración. En esta ocasión, le ofreció al Banco las garantías colaterales o fuentes secundarias de repago que detallamos a continuación: (1) hipoteca en rango de tercera sobre el solar y la residencia conyugal de la licenciada Vázquez y el señor Andújar Ruiz; (2) primera hipoteca sobre bienes muebles de la corporación (equipo y maquinaria); (3) cesión a favor del Banco de las cuentas por cobrar de la corporación, y (4) firma, como deudores personales y solidarios, de la licenciada Vázquez y el señor Andújar Ruiz.
Esta vez, tomando en cuenta las referidas garantías, el *6 Comité de Crédito del Banco aprobó el préstamo de $300,000. Lo hizo el 19 de abril de 1996, con intereses a razón de 2% sobre la tasa preferencial anual, con un término de repago de siete años, a base de setenta y ocho pagos mensuales escalonados y una moratoria inicial de seis meses en el pago de principal.
Así, el 19 de abril de 1996, y conforme a los términos establecidos para la concesión del préstamo, la licenciada Vázquez suscribió una “Carta de Garantía Personal” para garantizarlo solidariamente. También suscribió en igual fecha un contrato de préstamo en calidad de “Garantizadora Solidaria”. Por último, ese mismo día suscribió junto a su esposo, en calidad de deudores solidarios, un pagaré a favor del Banco por la suma principal de $300,000. La consideración y aprobación del préstamo se llevó a cabo sin intervención indebida de la licenciada Vázquez quien, en ese entonces, continuaba fungiendo como Líder de Grupo de Asuntos Legales del Banco.
Efectivo el 3 de marzo de 1997, la licenciada Vázquez fue seleccionada para ocupar un puesto en ascenso en el servicio de carrera del Banco. Se trató del puesto de Directora de Control de Calidad de Crédito. Este puesto conllevaba las funciones de planificar, dirigir y supervisar las actividades y los procesos de verificación de crédito y financiamiento del Banco.
El 26 de marzo de 1997, estando en incumplimiento de pago, Hecson solicitó al Banco una moratoria adicional de seis meses para el pago del principal y los intereses del préstamo. No había hecho pago alguno a esa fecha. La moratoria fue aprobada por el Comité de Crédito del Banco.
No obstante, vencida la moratoria, Hecson continuó en incumplimiento de pago. Esta vez decidió solicitar al Banco tres cosas: (1) otra moratoria de seis meses para el pago de principal e intereses, (2) la reestructuración de su financiamiento, de acuerdo con la situación económica de la corporación en ese momento, y (3) un crédito adicional por *7 $100,000. El Comité de Crédito del Banco aprobó la moratoria y la reestructuración solicitada, pero denegó el financiamiento adicional.
La licenciada Vázquez, en ese entonces Directora de Control de Calidad de Crédito del Banco, fungía también como Secretaria de su Comité de Crédito.(2) Sobre este particular, debemos destacar que, cuando en las reuniones del Comité de Crédito se discutía el incumplimiento del préstamo en cuestión, la licenciada Vázquez se inhibía de participar de la discusión.(3) Sin embargo, también es bueno apuntar que la licenciada Vázquez tenía conocimiento de tales discusiones, pues firmaba las minutas resultantes de las referidas reuniones. De hecho, la minuta de la reunión del Comité de Crédito del Banco, en la que se aprobó la última moratoria y reestructuración del financiamiento brindado a Hecson, está firmada por la licenciada Vázquez.(4)
A pesar de todo lo anterior, en noviembre de 1997 Hecson cesó operaciones. El 9 de febrero de 1998, personal del Banco se reunió con el señor Andújar Ruiz para discutir el estatus de su cuenta y los asuntos relacionados con el cierre operacional de la corporación. En dicha reunión, el señor Andújar Ruiz confirmó el referido cierre y expresó que la reestructuración del financiamiento aprobada por el Banco era académica, primero, debido al cierre, y segundo, debido a que Hecson no tenía los ingresos para cumplir con el compromiso que implicaba la reestructuración.(5)
El 23 de octubre de 1998, un acreedor hipotecario preferente sobre el solar y la residencia conyugal de la licenciada Vázquez y el señor Andújar Ruiz instó en el Tribunal de Primera Instancia una demanda de ejecución de hipo *8 teca contra ambos y la Sociedad Legal de Gananciales por ellos constituida. Aunque fueron emplazados, ni la licenciada Vázquez ni el señor Andújar Ruiz contestaron la demanda; tampoco comparecieron posteriormente al procedimiento judicial. En fin, éste se llevó a cabo en rebeldía y la hipoteca fue efectivamente ejecutada y el bien inmueble adjudicado.
La licenciada Vázquez nunca informó a sus superiores de la ejecución de una de las garantías o fuentes de repago en el préstamo concedido a Hecson. La ejecución y adjudicación del inmueble afectaron los intereses del Banco, pues de éstas no resultó sobrante monetario alguno para abonar a la deuda prestataria.(6)
Por otro lado, el 25 de abril de 2000, el Banco presentó en el Tribunal de Primera Instancia una demanda de cobro de dinero y ejecución de hipoteca inmueble y mueble contra Hecson, la licenciada Vázquez, su esposo y la Sociedad Legal de Gananciales compuesta por ambos.(7) La licenciada Vázquez y su esposo fueron emplazados personalmente. No obstante, no contestaron la demanda ni comparecieron a los procedimientos judiciales.(8) El 8 de mayo de 2002, el tribunal dictó una sentencia en rebeldía, condenándolos al pago solidario de $485,398.98, más intereses a razón de $55.01 diarios hasta el saldo total de la deuda.(9)
El Banco no ha podido hacer efectiva la sentencia. Según indicamos antes, el Banco perdió la garantía hipotecaria que tenía sobre el inmueble que constituyó el hogar conyugal de la licenciada Vázquez y el señor Andújar Ruiz. Igual suerte corrió el gravamen que, a favor del Banco, pesaba sobre los bienes muebles y las cuentas por cobrar *9 de Hecson; se dispuso de ambos sin el consentimiento de la institución bancaria.(10)
A la fecha en que se dictó la sentencia, la licenciada Vázquez había sido designada por el Banco al puesto de carrera de Directora de la División de Préstamos Especiales y Recobros.(11) Se desempeñaba precisamente en dicho puesto, cuando el 27 de febrero de 2002 la Sra. María M. Fuentes Pujols (señora Fuentes Pujols) —entonces Presidenta del Banco— luego de ordenar una investigación interna y obtener sus resultados, le cursó una carta en la que le formuló cargos. Le informó en la carta que el Banco tenía la intención de destituirla. Le informó, además, que tenía el derecho a solicitar la celebración de una vista administrativa informal de “pre-terminación de empleo(Énfasis suplido.)(12)
En la formulación de cargos se le imputó a la licenciada Vázquez incumplir, en su capacidad de garantizadora personal y solidaria, con el pago del préstamo en cuestión. También, se le imputó no honrar las garantías colaterales o fuentes secundarias de repago otorgadas por ella y su esposo al firmar el contrato de préstamo. Específicamente, se le imputó conocer, o haber debido conocer, la venta de los bienes muebles de la corporación y la disposición de sus cuentas por cobrar, bienes y cuentas sobre las cuales existía un gravamen a favor del Banco. La señora Fuentes Pujols informó a la licenciada Vázquez que “su conducta es constitutiva de faltas que justifican su terminación de empleo”.(13)
La licenciada Vázquez ejercitó su derecho a la vista ad *10 ministrativa informal de “pre-terminación de empleo”. Ésta se celebró el 14 de marzo de 2002.(14) La licenciada Vázquez compareció a ella representada por un abogado. Con posterioridad a su celebración, el 1 de abril de 2002, la señora Fuentes Pujols le cursó a la licenciada Vázquez una comunicación escrita en la que reafirmó los cargos imputados y le notificó su determinación de destituirla del puesto de carrera que ocupaba en el Banco, efectivo el 30 de abril de 2002.(15) También le advirtió de su derecho a solicitar una vista administrativa formal ante un oficial examinador. Al momento de su destitución, la licenciada Vázquez devengaba, como Directora de la División de Préstamos Especiales y Recobros, un salario mensual de $5,408.(16)
El 3 de mayo de 2002, la licenciada Vázquez presentó una querella formal ante la Junta de Directores del Banco. En ésta alegó que fue destituida sin justa causa, en violación a su derecho constitucional a un debido proceso de ley.(17)
El 29 de mayo de 2002, el Banco contestó la querella. Designado el oficial examinador que presidiría la vista administrativa formal, ésta se celebró finalmente los días 2 y 3 de diciembre de 2003 y 15 de marzo de 2004.
El 18 de octubre de 2004, el oficial examinador emitió una resolución en la que declaró “con lugar” la querella presentada por la licenciada Vázquez. Determinó que el Banco la destituyó sin justa causa, en violación “a sus derechos como empleada del Banco y contrario al principio de mérito”. (Énfasis suplido.)(18) Además, ordenó al Banco que *11 reinstalara inmediatamente a la licenciada Vázquez al puesto de carrera de Directora de la División de Préstamos Especiales y Recobros, y satisfacerle los salarios y beneficios marginales dejados de percibir desde la fecha de su destitución hasta el momento cuando fuese reinstalada.(19)
Denegada por el oficial examinador una solicitud de reconsideración, el Banco presentó un recurso de revisión administrativa ante el Tribunal de Apelaciones. El foro intermedio apelativo confirmó el dictamen recurrido y denegó al Banco una subsiguiente moción de reconsideración.
Inconforme, el Banco presentó ante nos un oportuno recurso de certiorari, señalando los errores siguientes:
A. Erró el Tribunal de Apelaciones al confirmar al Hon. Oficial Examinador al concluir que no existía justa causa para el despido de la Lie. Vázquez.
B. Erró el Tribunal Apelativo al concluir que la Lie. Vázquez no incurrió en conflicto de intereses.
C. Erró el Tribunal Apelativo al concluir que la Lie. Vázquez no incurrió en conducta desleal.
D. Erró el Hon. Oficial Examinador al conceder los remedios otorgados.
E. Erró el Tribunal de Apelaciones al confirmar al Oficial Examinador y no disponer que el despido fue uno justificado. (Énfasis suprimido.) Certiorari, pág. 10.
El 3 de marzo de 2006 expedimos el recurso de certiorari. Con el beneficio de la comparecencia de ambas partes, nos encontramos en posición de resolver.
II
Por estar estrechamente relacionados, discutiremos los errores señalados conjuntamente.
A. El Banco de Desarrollo Económico para Puerto Rico
El Banco es una dependencia y corporación pública del Estado, creado en virtud de la Ley Núm. 22 de *12 24 de julio de 1985, Ley del Banco de Desarrollo Económico para Puerto Rico.(20) Esta corporación tiene como propósito de alto interés público la promoción del desarrollo del sector privado en la economía de Puerto Rico, haciendo disponible a cualquier persona, firma, corporación, sociedad, institución financiera, cooperativa u otra organización privada, con o sin fines de lucro, préstamos directos, garantías de préstamos y fondos para invertir en dichas empresas, dando preferencia a los pequeños y medianos empresarios puertorriqueños.(21)
El Banco tiene “personalidad legal propia y existencia separada del Estado Libre Asociado de Puerto Rico y de cualquiera de sus agencias, instrumentalidades o corporaciones públicas”, por lo cual puede demandar y ser demandado. Sus “deudas, obligaciones, contratos, pagarés, recibos, gastos, cuentas, fondos, empresas y propiedades” son “de su única responsabilidad y no de la responsabilidad del Estado Libre Asociado de Puerto Rico, sus agencias, instrumentalidades y corporaciones públicas”.(22) Sus negocios son administrados —y sus poderes corporativos ejercidos— por una Junta de Directores compuesta por nueve miembros, cinco de los cuales son funcionarios públicos y cuatro son representantes del sector privado, nombrados por el Gobernador con el consejo y consentimiento del Senado.(23)
B. El principio de mérito
1. La Ley de Personal del Servicio Público de Puerto Rico
En el sector del empleo público rige, como política *13 pública, el principio de mérito.(24) Este principio tiene como propósito que quienes sirvan al Gobierno sean los más aptos y que todo empleado sea seleccionado, adiestrado, ascendido y retenido en su empleo en consideración al mérito y a la capacidad, sin discrimen por razones de raza, color, sexo, nacimiento, edad, origen o condición social, ni por ideas políticas o religiosas, condición de veterano ni impedimento físico o mental.(25)
La Ley de Personal del Servicio Público de Puerto Rico de 1975, según fuera enmendada(26) (antigua Ley de Personal de 1975), aplicable a los hechos del caso de marras, establecía en su Sec. 10.6 que sus disposiciones no aplicaban, entre otros, a los empleados de las agencias o dependencias del Gobierno que funcionan como empresas o negocios privados, ni a los empleados de agencias o dependencias del Gobierno que tengan derecho a negociar colectivamente.(27) Sin embargo, esa misma sección aclaraba que dichas agencias o dependencias tenían que
... adoptar, con el asesoramiento de la Oficina de Personal, y dentro de los próximos 120 días de la aprobación de esta ley, un reglamento de personal incorporando el principio de mérito que regirá las normas de personal de aquellos empleados no cubiertos por convenios colectivos. (Enfasis suplido.)(28)
Interpretando la referida Sec. 10.6 de la antigua Ley de *14 Personal de 1975, destacamos en Reyes Coreano v. Director Ejecutivo, 110 D.P.R. 40, 47-48 (1980), que
[e]Z mandato a que se refiere el párrafo anteriormente transcrito, analizado a la luz de los principios de política pública proclamados con carácter general en la Sec. 2.1 de la ley, re-vela sin duda la clara intención legislativa de efectuar la armónica instrumentación de uno de los principales objetivos de la ley: extender los beneficios de una administración de personal basada en el principio de mérito al mayor número posible de sectores públicos. A esos fines le impuso a dichas agencias la indefectible obligación de administrar su personal no unionado de conformidad con el principio de mérito, aun cuando en atención a sus particulares circunstancias quedaran efectivamente excluidas de las restantes disposiciones de la ley. Téngase presente en este sentido, que el principio de mérito existe únicamente en virtud de y de conformidad a como ha sido formulado en la Ley de Personal.
El historial de la medida confirma que fue ésta y no otra la intención legislativa. Los antecedentes de la ley destacan la importancia que para sus objetivos representaba la reafirmación del principio de mérito como norma rectora en la administración de personal y su extensión de manera uniforme a todos los sectores del servicio público. Así, el Informe Explicativo del anteproyecto propuesto por el Gobernador a la Asamblea Legislativa advirtió claramente el propósito de extender el principio de mérito “a todos los sectores del servicio público: empleados estatales —incluyendo losr de las corporaciones públicas— empleados municipales”. (Enfasis suplido y escolio omitido.)
Más adelante, añadimos:
Igualmente el Informe de las Comisiones de Gobierno y de Derechos Civiles del Senado al P. del S. 1428 afirma en la página 27 que “el principio de mérito se hace extensivo a todo el servicio público de Puerto Rico (y no solamente a la tercera parte que ahora tiene esta protección)”. (Enfasis suplido.)(29)
En el 2000 extendimos estas expresiones al caso Rodríguez v. Bco. Gub. de Fom. P.R., 151 D.P.R. 383, 410-411 (2000). Allí, la parte demandada era el Banco Guberna *15 mental de Fomento, corporación pública creada con propósitos muy similares a los del Banco; esto es, fomentar la economía de Puerto Rico y especialmente su industrialización, proveyendo una fuente de financiamiento a personas naturales o jurídicas dedicadas a la manufactura, al comercio, a la agricultura o al turismo, con énfasis en los medianos y pequeños comerciantes, mediante préstamos directos, garantías de préstamos, así como de inversiones de capital.(30)
En Rodríguez v. Bco. Gub. de Fom. P.R., supra, expresamos que a pesar de la exclusión de varias Ramas y agencias del Gobierno de las disposiciones de la antigua Ley de Personal de 1975, que obedecían, en el caso de las Ramas, al respeto del principio de la separación de poderes, y en el caso de la agencias, para evitar cualquier conflicto con los convenios colectivos que regían en ellas, “la política pública del Estado Libre Asociado ha sido la de extender el principio del mérito a todo el servicio público, incluso a las agencias e instrumentalidades excluidas por la mencionada ley de personal”. (Enfasis suplido.)(31)
Cabe destacar que los pronunciamientos que hemos hecho relativos a la política pública del Estado de extender el principio del mérito a todo el servicio público mantienen vigencia, pues la See. 5.3 de la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004, según enmendada(32) (nueva Ley de Personal de 2004), en términos muy similares a su antecesora, dispone que no aplicará “a las corporaciones o instrumentalidades públicas o público-privadas que funcionan como *16 empresas o negocios privados”. (Énfasis suplido.)(33) Pero adviértase que, igual que su antecesora, aclara y manda lo siguiente:
[e]n el caso de las corporaciones públicas o público-privadas deberán adoptar reglamentos de personal que incorporen el principio de mérito a la administración de sus recursos humanos, conforme lo dispone esta ley. (Enfasis suplido.)(34)
Por su parte, el Art. 4 de la ley habilitadora del Banco facultó a su Junta de Directores a promulgar políticas, reglamentos y procedimientos para disponer “de todos los asuntos del personal del Banco se efectuaron sin sujeción a la Ley Núm. 5 del 14 de octubre de 1975, conocida como ‘Ley de Personal del Servicio Público de Puerto Rico’ ”.(35) Es decir, la ley habilitadora del Banco (de 1985), en armonía con la antigua Ley de Personal de 1975 y la nueva Ley de Personal de 2004, establece que los empleados del Banco están efectivamente excluidos de las disposiciones particulares de la legislación de personal del servicio público.
No obstante, ello nada tiene que ver con el mandato legal de que en el Banco rija, vía reglamento de personal, el principio de mérito, conforme a cómo ha sido formulado en la legislación de personal.
2. El reglamento de personal del Banco de Desarrollo Económico para Puerto Rico
La licenciada Vázquez siempre fue, hasta el momento de su destitución, una empleada regular del Banco destacada en su servicio de carrera.(36) En todo momento, y durante el proceso de su destitución, los asuntos de personal de la corporación pública se rigieron por las disposiciones del Reglamento de Recursos Humanos del Banco de Desa *17 rrollo Económico para Puerto Rico BDE-007, Reglamento Núm. 5572 del Departamento de Estado de 7 de abril de 1997 (Reglamento de Personal).(37) Este reglamento fue aprobado por la Junta de Directores del Banco allá para el 25 de marzo de 1997 y presentado en el Departamento de Estado el 7 de abril del mismo año.
La “base legal” (Art. 2) del Reglamento de Personal, supra, pág. 1, establece:
Este reglamento se promulga en virtud de lo dispuesto en el Artículo 4 de la Ley Núm[.] 22 del 24 de julio de 1985, conocida como la “Ley del Banco de Desarrollo Económico para Puerto Rico”, según enmendada, en la disposición de la Sección 10.6 de la Ley Núm. 5 del 14 de octubre de 1985, según enmendada, Ley de personal del Servicio Público y conforme a la Ley Núm. 170 del 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme. (Enfasis suplido.)
Por su parte, el Art. 3, titulado “Propósito”, de dicho cuerpo reglamentario, supra, págs. 1-2, dispone lo siguiente:
Se adopta este reglamento con el propósito de establecer las normas que regirán la administración de los Recursos Humanos en el Banco de Desarrollo Económico para Puerto Rico. Se establece que el principio de mérito será el concepto rector en la administración de los recursos humanos del Banco, asegurando así que sean los más capacitados quienes sirvan al Banco y que los empleados sean seleccionados, adiestrados, as *18 cendidos, retenidos y tratados en todo lo referente a su empleo en consideración única del mérito sin que medie discrimen por razones de raza, color, sexo, nacimiento, edad, origen o condición social, impedimentos ni por ideas políticas o religiosas. (Enfasis suplido.)
De otro lado, el Art. 18, sobre la retención y separación del servicio, del reglamento, supra, pág. 55, específicamente en su See. 5, titulada “Seguridad en el Empleo”, se afirma que
[i] os empleados regulares de Carrera tendrán continuidad en sus puestos, siempre que satisfagan los criterios de productividad, rendimiento, orden y disciplina que deben prevalecer en el Banco. (Enfasis suplido.)
Asimismo, el cuarto capítulo del concernido reglamento, titulado “Disciplina de Empleados”, específicamente en su Art. 19 —“Acciones Correctivas de Disciplina”— See. 2(18) —“Normas”— indica lo siguiente: “[e] 1 Banco mantendrá unas guías de las acciones correctivas de disciplina para cada ofensa que se cometa.” Reglamento de Personal, supra, pág. 67.
Relacionado con las acciones de disciplina que el Banco puede tomar contra sus empleados, el capítulo cinco, titulado “Quejas de Empleados”, específicamente en el Art. 20 —“Procedimiento para Atender Quejas”— See. 3, del Reglamento de Personal, supra, establece un procedimiento de cuatro pasos para considerar y adjudicar formalmente cualquier queja de un empleado regular de carrera. El cuarto paso del referido procedimiento adjudicativo formal dispone:
Paso 4: Si el empleado afectado aún no está satisfecho, éste deberá presentar una querella formal a la Oficina del Presidente [del Banco] en un término de treinta (30) días calendario contados a partir del recibo de la notificación que le hiciera el Vicepresidente de Recursos Humanos. El Presidente, nombrará a un Oficial Examinador ajeno al Banco para que celebre una vista administrativa formal sobre la queja del empleado, la cuál se llevará a cabo a tenor con el procedimiento *19 que se dispone en la Ley 170 del 12 de agosto de 1988, según enmendada [Ley de Procedimiento Administrativo Uniforme, por sus siglas L.P.A.U.] y con el Procedimiento Administrativo Ante un Oficial Examinador para Atender Querellas que se haya aprobado.

En la vista, el empleado tendrá derecho a estar representado legalmente, se tomará récord taquigráfico y el Oficial Examinador designado deberá realizar determinaciones de hecho y conclusiones de derecho.

El Oficial Examinador notificará la resolución administrativa del caso, a tenor con las Reglas de Procedimiento Administrativo Ante un Oficial Examinador, aprobadas el 12 de junio de 1996. (Énfasis suplido.) íd., pág. 73.
3. El Reglamento de Procedimiento Administrativo ante un Oficial Examinador
Tal como lo expresa el transcrito “Paso 4” del Procedimiento para Atender Quejas, el Banco promulgó un reglamento titulado Reglas de Procedimiento Administrativo ante un Oficial Examinador, Reglamento Núm. 5489 del Departamento de Estado de 8 de octubre de 1996.(38) La Regla 25 de este último reglamento, titulada “Resoluciones y Órdenes”, específicamente la Subregla 25.1, dispone que
[l]a resolución en los méritos contendrá una relación de hechos probados, conclusiones de derecho y dispondrá la orden que en derecho proceda. (Énfasis suplido.) Reglamento de Personal, supra, pág. 14.
Asimismo, la Regla 26 del mencionado Reglamento Núm. 5489, supra, pág. 15, titulada “Remedios”, añade lo siguiente:
26.1 Toda resolución otorgará el remedio que en derecho proceda aún cuando las partes no lo hayan solicitado.
26.2 En los casos en que una de las partes haya actuado con temeridad, se impondrá el pago de honorarios de abogado e interés, conforme lo dispuesto en la Regla 44.1(d) y 44.3 de *20 Procedimiento Civil que se utiliza en los tribunales. (Énfasis suplido.)
Es menester señalar que, en la Regla 26, este reglamento también establece el derecho a solicitar una reconsideración ante un oficial examinador, en conformidad con la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.).(39) Además, el reglamento en cuestión incluye, en su Regla 29, el derecho a una revisión judicial conforme a la L.P.A.U. Expresa la referida regla que el escrito de revisión judicial deberá presentarse ante el Tribunal de Apelaciones, conforme al reglamento de dicho tribunal, y en particular, según las reglas relativas a la revisión de las decisiones administrativas.
C. El derecho de retención como paradigma del principio de mérito: la reinstalación en el puesto como remedio
Dentro del contexto del principio de mérito, la See. 4.6(1) de la Ley de Personal de 1975 (3 L.P.R.A. see. 1336(1) (ed. 1978)), establecía lo siguiente:
[s]e proveerá seguridad en el empleo a aquellos empleados de carrera que satisfagan los criterios de productividad, eficiencia, orden y disciplina que deben prevalecer en el servicio público. (Énfasis suplido.(40)
A la luz del concepto principio de mérito, en Rodríguez v. Bco. Gub. de Fom. P.R., supra, pág. 410, interpretamos la citada sección y expresamos:
Paradigma de este principio es el derecho de retención, esto es, el de ser provisto de seguridad en el empleo a aquellos empleados de carrera idóneos, que satisfagan los requisitos de produc *21 tividad y disciplina que deben prevalecer en el servicio público. (Énfasis suplido.)
En relación con este particular, hemos resuelto que un empleado público de carrera tiene un reconocido y protegido interés legal en la retención de su empleo.(41) Es precisamente por ello que este tipo de empleado, con estatus regular, posee una expectativa de continuidad en el empleo, que forma parte de su derecho de propiedad, de lo cual no puede ser privado sin que medie el debido proceso de ley.(42)
No obstante, mucho más pertinentes a este caso son nuestras expresiones en Carrón Lamoutte v. Compañía de Turismo, 130 D.P.R. 70 (1992). Como sabemos, tanto la Compañía de Turismo como el Banco Gubernamental de Fomento de Puerto Rico y el Banco de Desarrollo Económico para Puerto Rico son corporaciones públicas excluidas de la legislación de personal del servicio público. Con ello en mente, veamos lo que allí expresamos:
Al evaluar la controversia de autos recordemos que la Compañía de Turismo es “una corporación pública e instrumentalidad gubernamental del Estado Libre Asociado”, 23 L.P.R.A. sec. 671a, excluida del sistema de personal del servicio público. Sin embargo, en conformidad con la Sec. 10.6 de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.RR.A. see. 1338(3) y (4), la Compañía de Turismo adoptó un reglamento de personal que extendió el principio de mérito a los empleados no cubiertos por convenio colectivo.
El Reglamento de Personal de la Compañía de Turismo de Puerto Rico establece dos (2) categorías de empleados y dis-pone un procedimiento para el reclutamiento, ascenso, destitución y cesantía según su capacidad y bajo el principio de mérito. Mediante este ordenamiento, los empleados de carrera adquirieron un reconocido interés propietario en la retención de su empleo. Una vez se le reconoció ese derecho, el Estado no *22 puede privárselo sin unas garantías procesales que cumplan con el debido proceso de ley.
Bajo esta normativa, y considerando nuestros pronunciamientos en Torres Solano v. P.R.T.C., supra, los empleados de carrera de la Compañía de Turismo están protegidos por la cláusula constitucional del debido proceso de ley. (Enfasis suplido y en el original.) Carrón Lamoutte v. Compañía de Turismo, supra, págs. 81-82.
De forma compatible con todo lo anterior, hemos expresado que el principio de mérito es integral, pues cubre tanto la selección del empleado como su destitución.(43) Así, en los casos de destitución de un empleado público de carrera, si la decisión resultante del proceso adjudicativo administrativo es favorable al empleado, hemos resuelto que lo que procede es “ordenar su restitución y el pago total, o parcial, de los salarios dejados de percibir por éste desde la fecha de efectividad de la destitución, más los beneficios marginales a que hubiese tenido derecho”. (Enfasis suplido.)(44)
Finalmente, hacemos hincapié en que hemos reconocido estos mismos remedios a los empleados de carrera que laboran en corporaciones públicas excluidas de la legislación de personal del servicio público, que han adoptado el principio de mérito vía sus respectivos reglamentos de personal.(45)
D. Mecanismo de revisión judicial
El Art. 4.006 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003 dispone:
*23 El Tribunal de Apelaciones conocerá de los siguientes asuntos:
(c) Mediante recurso de revisión judicial, que se acogerá como cuestión de derecho, de las decisiones, órdenes y resoluciones finales de los organismos o agencias administrativas. En estos casos, la mera presentación del recurso no paralizará el trámite en el organismo o agencia administrativa ni será obligatoria la comparecencia del Estado Libre Asociado ante el foro apelativo a menos que así lo determine el tribunal. El Procedimiento a seguir será de acuerdo con lo establecido por la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como la “Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico”.(46)
Al amparo del casi idéntico lenguaje del Art. 4.002 de la derogada Ley de la Judicatura de Puerto Rico de 1994,(47) hemos resuelto que el Tribunal de Apelaciones es el foro con competencia para entender en la revisión de una determinación final de un oficial examinador agencial, en el contexto administrativo interno de la destitución de un empleado cobijado por el principio de mérito, destacado en una entidad excluida de la legislación de personal del servicio público, y cuyo reglamento de personal y reglamento para revisar acciones de personal facultan al Tribunal de Apelaciones para así hacerlo.(48)
E. Conclusión
El análisis integral de lo expresado hasta aquí nos lleva a concluir inexorablemente lo siguiente. El Banco es una corporación pública excluida de la legislación de personal del servicio público, pero que, en cumplimiento de un mandato legislativo, incorporó en sus reglamentos de personal y para revisar las acciones de personal, el principio de mérito. Al nombrar a la licenciada Vázquez como empleada regular de carrera, le otorgó, según dichos regla *24 mentos, una seguridad de empleo y, por ende, un derecho propietario sobre su puesto. Por ello, sólo podía ser destituida previa formulación de los cargos, la celebración de una vista y una justa causa, es decir, con el debido proceso de ley.
La Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como Ley de Indemnización por Despido Injustificado,(49) no tiene lugar en la controversia de marras, porque la licenciada Vázquez, como empleada regular en el servicio de carrera del Banco, gozaba de una mayor y más completa protección al amparo del principio de mérito, según lo conocemos. La Ley Núm. 80, supra, sólo provee como remedio una compensación económica a los empleados despedidos injustificadamente, comúnmente conocida como “mesada”. Sin embargo, de haber sido destituida sin justa causa, la licenciada Vázquez tenía derecho a la reinstalación en su puesto, con la paga de los salarios y beneficios marginales dejados de percibir hasta la fecha de su reposición. Como cuestión de realidad, esos remedios le fueron provistos por el oficial examinador que presidió la vista administrativa formal de destitución, y fueron confirmados por el Tribunal de Apelaciones.
Finalmente, destacamos que la determinación que sobre su destitución hizo el Oficial Examinador designado por el Banco, sólo era revisable a la luz de las normas que nuestro ordenamiento legal provee (según vimos, incorporadas en la reglamentación de personal del Banco) para objetar las decisiones administrativas.
III
Aclarado lo anterior, procede que pasemos a la cuestión central del caso de autos, esto es, revisar la sentencia del Tribunal de Apelaciones, confirmatoria de la decisión del Oficial Examinador designado por el Banco, al efecto de *25 que el Banco destituyó sin justa causa a la licenciada Vázquez. Lo haremos a la luz del estándar de revisión de determinaciones administrativas.
La L.P.A.U. dispone que las determinaciones de hecho de las agencias serán sostenidas por los tribunales si se fundamentan en evidencia sustancial que obre en el ex-pediente administrativo,(50) siendo evidencia sustancial aquella que una mente razonable podría aceptar como adecuada para sostener una conclusión.(51) “Lo anterior, pretende ‘evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor’.”(52)
Sin embargo, las conclusiones de derecho de los organismos administrativos, que no involucran interpretaciones efectuadas dentro del ámbito de especialización de la agencia concernida, son revisables en toda su extensión.(53)
Así las cosas, “los tribunales se abstendrán de avalar o deferir a la interpretación de la agencia si ésta: (1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales”.(54) En otras palabras, la deferencia judicial a la determinación administrativa cede ante una actuación irrazonable o ilegal.(55) “[A] los tribunales no les corresponde imprimir un sello de corrección, so pretexto de *26 deferencia, para avalar situaciones en que la interpretación de la agencia resulte contraria a derecho.”(56)
En este caso, el oficial examinador determinó como hecho probado que la licenciada Vázquez, junto a su esposo, garantizaron solidaria y personalmente el préstamo de $300,000 que el Banco extendió a Hecson, incorporada y dirigida precisamente por su empleada, la licenciada Vázquez, y su esposo. Asimismo, para convencer al Banco a aprobar el financiamiento, además de la garantía solidaria y personal ofrecida por los esposos, éstos ofrecieron varias garantías o fuentes de repago adicionales, a saber: (1) hipoteca en rango de tercera sobre el solar y residencia conyugal, (2) primera hipoteca sobre bienes muebles de la corporación —equipo y maquinaria— por $206,000, y (3) cesión de cuentas por cobrar de la corporación a favor del Banco. Se fue tomando en cuenta las garantías colaterales o fuentes secundarias de repago ofrecidas y el Comité de Crédito del Banco finalmente aprobó la transacción. Determinó, además, que la recurrida no intervino indebidamente en la aprobación del préstamo por parte de su patrono; luego de su aprobación, el Banco la ascendió en dos ocasiones, siendo su último puesto el de Directora de la División de Préstamos Especiales y Recobros. Incluso, la licenciada Vázquez fue miembro del Comité de Crédito del Banco desde marzo de 1997 hasta marzo de 2001. Fungía como su Secretaria.
Por otro lado, se desprende de las determinaciones de hecho del oficial examinador que el incumplimiento con el pago del préstamo llevó al Banco, a solicitud de Hecson, a otorgarle dos moratorias adicionales en el pago de principal e intereses, en lo que no intervino la licenciada Vázquez. Sin embargo, el Oficial Examinador determinó que en noviembre de 1997 Hecson cerró operaciones, y no *27 fue sino en febrero de 1998 cuando el esposo de la licenciada Vázquez (no ella) lo informó al Banco.
De otra parte, de las determinaciones de hechos del oficial examinador surge que un acreedor preferente ejecutó su hipoteca sobre el solar y la residencia de la licenciada Vázquez y su esposo. El procedimiento de ejecución se efectuó en rebeldía, pues, a pesar de haber sido emplazados, ni la licenciada Vázquez ni su esposo contestaron la demanda ni comparecieron a los procedimientos. La licenciada Vázquez nunca informó al Banco la ejecución de una de sus garantías o fuentes de repago en el préstamo concedido a Hecson. De dicha ejecución no resultó sobrante alguno para abonar a la acreencia del Banco.
Por otro lado, de las determinaciones de hechos del oficial examinador se desprende que la licenciada Vázquez tampoco informó al Banco que, además de la hipoteca inmueble, éste había perdido las garantías colaterales de hipoteca sobre bienes muebles y sobre las cuentas por cobrar de Hecson. La corporación dispuso de los unos y de las otras, sin el consentimiento del Banco. En síntesis, Hecson no realizó pago alguno acreditable a la deuda. Los garantizadores personales y solidarios del préstamo —la licenciada Vázquez y su esposo— tampoco hicieron pago alguno acreditable a la cuenta. Asimismo, el Banco se vio imposibilitado de cobrar su acreencia a través de sus otras garantías colaterales.
Finalmente, surge de las determinaciones de hechos que el Banco se vio en la obligación de demandar en cobro del préstamo impagado a su Directora de la División de Préstamos Especiales y Recobros, y Secretaria de su Comité de Crédito, es decir, a la licenciada Vázquez; también, a su esposo y a Hecson, de esta última, como sabemos, la licenciada Vázquez era incorporadora y directora. Se desprende, además, que la licenciada Vázquez y su esposo fueron emplazados personalmente y tampoco contestaron la demanda ni comparecieron a los procedimientos. El Tribu *28 nal de Primera Instancia terminó dictando una sentencia en rebeldía contra la licenciada Vázquez y su esposo, en carácter solidario, por la suma de $485,398.98, más intereses a razón de $55.01 diarios hasta el saldo total de la deuda.
El oficial examinador determinó que el Banco destituyó a la licenciada Vázquez por haber incumplido con el pago del préstamo del cual ella era garantizadora personal y solidaria, y por serle imputable el incumplimiento de Hecson, que vendió y dispuso de los bienes muebles y cuentas por cobrar de la corporación, gravados a favor del Banco. Todo ello con el resultado de la pérdida para el Banco de una cuenta de poco menos de medio millón de dólares.
No obstante, el oficial examinador concluyó, como cuestión de derecho, que la destitución de la licenciada Vázquez fue sin justa causa. Se fundamentó, esencialmente, en que su obligación como deudora, su incumplimiento de pago, la ausencia de acciones afirmativas de su parte en protección de los intereses del Banco —en cuanto al préstamo se refiere— y sus actuaciones contrarias a tales intereses, nada tenían que ver con sus ejecutorias como empleada, es decir, como Directora de la División de Préstamos Especiales y Recobros dei Banco. Además, apoyó su decisión en el hecho de que en el proceso de aprobación del préstamo a Hecson, la licenciada Vázquez no violó la Ley de Etica Gubernamental del Estado Libre Asociado de Puerto Rico (Ley de Ética Gubernamental)(57) ni la ley habilitadora del Banco. Concluyó que todo lo anterior, en unión a que la licenciada Vázquez cumplía con los deberes de su puesto y que no intervino indebidamente ni en la aprobación del préstamo ni en la concesión de sus moratorias de pago, hacían de su destitución una sin justa causa.
Por su parte, el Tribunal de Apelaciones, luego de citar in extenso la resolución del oficial examinador, confirmó su *29 decisión. Erraron ambos como cuestión de derecho. El problema no radicó en la etapa de la perfección del préstamo en controversia, sino en la etapa del cumplimiento de su pago, vista desde la perspectiva de los puestos que ocupaba la licenciada Vázquez en el Banco. Veamos.
Las Guías para Acciones Correctivas de Disciplina, que forman parte del Procedimiento para Aplicar Acciones Correctivas de Disciplina del Banco,(58) disponen que ocultar información que afecte al Banco conlleva la sanción de destitución a la primera falta.(59)
Por otro lado, establecen que incurrir en actuaciones que impliquen un conflicto de intereses con sus obligaciones en el Banco conlleva las sanciones siguientes: en una primera falta, entre la sanción mínima de una reprimenda escrita y una máxima como la suspensión de empleo y sueldo por quince días; en una segunda infracción, entre la sanción mínima mínimo de una suspensión de empleo y sueldo de quince a treinta días, y una máxima como la destitución. Finalmente, disponen que violar la Ley de Etica Gubernamental y sus reglamentos, o cualquier otra disposición relacionada a la ética de los empleados públicos, conlleva las sanciones siguientes: en una primera falta, entre la sanción mínima como una reprimenda verbal y una máxima como una reprimenda escrita; en una segunda infracción, entre la sanción mínima de una reprimenda escrita y una máxima como la suspensión de empleo y sueldo de uno a quince días; en una tercera falta, entre la sanción mínima como la suspensión de empleo y sueldo de uno a treinta días, y una máxima como la destitution.(60)
No albergamos dudas de que la licenciada Váz *30 quez incurrió en ambas faltas. No obstante, somos del criterio de que es la unión de ambas, más su patrón de ocultar información que afectaba al Banco, lo que constituyó justa causa para su destitución. Nótese que las referidas guías sí disponen la destitución ante esta última falta. En torno a ocultar información que afecte al Banco, como falta, resaltamos lo siguiente. El verbo “ocultar” es definido como “esconder, tapar, disfrazar, encubrir a la vista; callar advertidamente lo que se pudiera o debiera decir, o disfrazar la verdad”.(61)
La licenciada Vázquez le declaró al Banco que garantizaba solidaria y personalmente el cumplimiento del préstamo concedido a Hecson. A sabiendas del craso incumplimiento de pago de Hecson, nunca hizo abono alguno a la deuda en su carácter personal de garantizadora solidaria. Tampoco tomó iniciativa alguna dirigida a pagar, aunque fuera por medio de un plan de pago. Llama la atención que, al momento de su destitución, su salario mensual era de $5,408;(62) sin embargo, no se inmutó. En ese sentido, es claro e indiscutible que le incumplió a su patrono. Miró para el lado, y se hizo la desentendida.
Por otro lado, la licenciada Vázquez nunca informó al Banco de que la corporación —que dirigió junto a su esposo— cesó operaciones prácticamente en el mismo tiempo en que el Comité de Crédito del Banco le estaba otorgando una segunda moratoria en el pago de principal e intereses. Recordemos que la licenciada Vázquez era miembro de dicho Comité. Tampoco tuvo la iniciativa de informar a sus superiores de que un acreedor preferente estaba ejecutando su residencia conyugal, que constituía una de las garantías del préstamo en cuestión. El mismo modus operandi exhibió en relación con los bienes muebles y las cuentas por cobrar de Hecson, que ella y su esposo, como *31 sus directores, decidieron gravar a favor del Banco en garantía adicional del préstamo. La empresa, que obviamente actúa a través de sus dirigentes, dispuso de estas otras dos garantías colaterales y ella, independientemente de si participó o no directamente de dicho proceder, cuanto menos, no lo informó a su patrono. Por lo tanto, también es claro que la licenciada Vázquez incurrió en conducta desleal —de ocultamiento y encubrimiento— que perjudicó los intereses de su patrono; protegió los suyos, mas no los del Banco ni los del Pueblo de Puerto Rico, quien en todo caso es el último afectado por la situación.
De otra parte, la Ley de Ética Gubernamental define el conflicto de intereses como aquella situación en la que el interés personal o económico del empleado público o de las personas relacionadas con éste, está o puede razonablemente estar en pugna con el interés público.(63) Dicha ley proscribe incurrir en ese tipo de conducta.(64) Según vimos, mediante las Guías de Acciones Correctivas de Disciplina, el Banco incorporó la referida prohibición, pues prescriben que un empleado no puede actuar en conflicto de interés con sus obligaciones en el Banco.
La licenciada Vázquez era miembro del Comité de Crédito del Banco y Directora de su División de Préstamos Especiales y Recobros. Por un lado, compartía la responsabilidad de evaluar, entre otras, las solicitudes de préstamos y de moratorias de pago que llegaban al Banco. Por el otro, tenía a su cargo atajar la morosidad y recobrar para el Banco el dinero adeudado por los clientes morosos. No obstante, nunca pagó su propia deuda con el Banco ni hizo intento o gestión afirmativa de clase alguna para hacerlo. Peor aún, su incumplimiento obligó al Banco a demandarla en cobro de dinero y su reacción ante ello fue ignorar el *32 procedimiento judicial, por lo que el tribunal tuvo que dictar en su contra una sentencia en rebeldía.
Nos preguntamos, ¿con qué fuerza moral la licenciada Vázquez podía exigir a los miembros de la división que ella dirigía que cobraran diligentemente las cuentas de los clientes morosos del Banco, si ella se burlaba de éste, debiéndole casi medio millón de dólares? Hiere la retina la situación del conflicto de interés en la que estaba inmersa la licenciada Vázquez como funcionaría de alta jerarquía del Banco. Sus intereses personales estaban antepuestos a los del Banco y a los del Pueblo de Puerto Rico. Se había recostado de su alta posición en el Banco para incumplirles.
En fin, la licenciada Vázquez incurrió, a la vez, en tres faltas listadas por el Banco en las Guías de Acciones Correctivas de Disciplina, una de las cuales conllevaba su destitución. Erró el Tribunal de Apelaciones al confirmar la determinación del Oficial Examinador designado por el Banco en este caso. Su sentencia debe ser revocada.
IV
Por los fundamentos antes expuestos, concluimos que en la destitución de la recurrida medió justa causa y revocamos la sentencia del Tribunal de Apelaciones que dispuso lo contrario.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Fuster Berlingeri emitió una opinión concurrente. La Jueza Asociada Señora Rodríguez Rodríguez no intervino.

 Apéndice del Certiorari, pág. 193.

 Fungió como Secretaria del Comité de Crédito desde marzo de 1997 hasta marzo de 2001, precisamente el tiempo que se desempeñó como Directora de Control de Calidad de Crédito del Banco.

 Apéndice del Certiorari, págs. 707-708 y 718.

 íd., págs. 261, 288 y 295.

 íd., pág. 297.

 Determinación de hecho Núm. 13, Resolución del Oficial Examinador, Apéndice del Certiorari, pág. 710.

 Determinación de hecho Núm. 15, id.

 Sentencia del Tribunal de Primera Instancia, Apéndice del Certiorari, págs. 358-359.

 íd., pág. 363.

 Apéndice del Certiorari, págs. 297 y 367.

 Determinación de hecho Núm. 18, Resolución del Oficial Examinador, Apéndice del Certiorari, pág. 715.

 Determinación de hecho Núm. 23, id., pág. 710. Véase, además, la carta de la Sra. María M. Fuentes Pujols de 27 de febrero de 2002, Apéndice del Certiorari, pág. 367.

 Carta de la Sra. María M. Fuentes Pujols de 27 de febrero de 2002, Apéndice del Certiorari, pág. 367.

 Determinación de hecho Núm. 21, Resolución del Oficial Examinador, Apéndice del Certiorari, págs. 714^715.

 Determinación de hecho Núm. 22, id., pág. 715. Véase, además, la Sentencia del Tribunal de Apelaciones, Apéndice del Certiorari, pág. 7.

 Determinación de hecho Núm. 24, Resolución del Oficial Examinador, Apéndice del Certiorari, pág. 715.

 Sentencia del Tribunal de Apelaciones, Apéndice del Certiorari, pág. 8.

 Resolución del Oficial Examinador, Apéndice del Certiorari, pág. 726.

 íd.

 7 L.P.R.A. secs. 611-611p.

 7 L.P.R.A. sec. 611a.

 7 L.P.R.A. secs. 611a(b) y 611b.

 7 L.P.R.A. sec. 611d.

 López v. C.E.E., 161 D.P.R. 527 (2004); Martínez v. Ofic. del Gobernador, 152 D.P.R. 586, 592 (2000); Rodríguez v. Bco. Gub. de Fom. P.R., 151 D.P.R. 383, 410 (2000); Reyes Coreano v. Director Ejecutivo, 110 D.P.R. 40 (1980).

 3 L.P.R.A. sec. 1461(41); Martínez v. Ofic. del Gobernador, supra, pág. 596; Rodríguez v. Bco. Gub. de Fom. P.R., supra, pág. 410; Reyes Coreano v. Director Ejecutivo, supra, pág. 55.

 3 L.P.R.A. see. 301 et seq. Esta ley fue derogada y sustituida por la vigente Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004, según enmendada, 3 L.P.R.A. see. 1461 et seq.

 3 L.P.R.A. see. 1338 (ed. 1978).

 íd.

 Reyes Coreano v. Director Ejecutivo, 110 D.P.R. 40, 48 (1980).

 Rodríguez v. Bco. Gub. de Fom. P.R., 151 D.P.R. 383, 396 y 403-404 (2000).

 Rodríguez v. Bco. Gub. de Fom. P.R., supra, pág. 411, citando a McCrillis v. Aut. Navieras de P.R., 123 D.P.R. 113, 132 (1989), y a Reyes Coreano v. Director Ejecutivo, supra, pág. 47.

 3 L.P.R.A. sec. 1461 et seq.

 3 L.P.R.A. sec. 1461e.

 íd.

 7 L.P.R.A. sec. 611b.

 Determinación de hecho Núm. 3 del Oficial Examinador, Apéndice del Certiorari, págs. 704 y 706.

 Este reglamento contenía unas normas aplicables “a los empleados del servicio de Carrera, del servicio de Confianza, empleados transitorios y aspirantes a empleo en el Banco”, según expone textualmente el Art. 4 (“Alcance”) del Reglamento de Recursos Humanos del Banco de Desarrollo Económico para Puerto Rico BDE-007, Reglamento Núm. 5572 del Departamento de Estado de 7 de abril de 1997 (Reglamento de Personal), pág. 3. En 2004 este reglamento fue anulado y sustituido por los reglamentos siguientes: (1) Reglamento de Recursos Humanos pasa el Servicio de Carrera del Banco de Desarrollo Económico para Puerto Rico BDE-014, Reglamento Núm. 6783, Departamento de Estado, 4 de marzo de 2004, y (2) Reglamento de Recursos Humanos para el Servicio de Confianza del Banco de Desarrollo Económico para Puerto Rico BDE-015, Reglamento Núm. 6784, Departamento de Estado, 4 de marzo de 2004. Así se separaron en reglamentos distintos las normas de personal aplicables a los empleados de carrera, de las aplicables a los empleados de confianza. Estos últimos dos reglamentos no aplican a los hechos de este caso.

 Este reglamento fue anulado y sustituido por el reglamento titulado Reglas de Procedimiento Administrativo ante un Oficial Examinador, Reglamento Núm. 7012 del Departamento de Estado de 20 de agosto de 2005. Este último no aplica al caso de autos.

 Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. see. 2101 et seq.

 3 L.P.R.A. ant. see. 1336. En iguales términos está redactada la See. 6.6 de la nueva Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004, según enmendada (nueva Ley de Personal de 2004), 3 L.P.R.A. sec. 1462e(l).

 Orta v. Padilla Ayala, 131 D.P.R. 227, 241 (1992); Torres Solano v. P.R.T.C., 127 D.P.R. 499 (1990); Pierson Muller I v. Feijoó, 106 D.P.R. 838, 852 (1978).

 Oria v. Padilla Ayala, supra, pág. 241; Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; Emdas. V y XIV, Const. EE.UU., L.P.R.A., Tomo 1; Torres Solano v. P.R.T.C., supra.

 Martínez v. Ofic. del Gobernador, supra, pág. 596.

 Hernández Badillo v. Municipio de Aguadilla, 154 D.P.R. 199, 203-204 (2001). Véanse, además: Estrella v. Mun. de Luquillo, 113 D.P.R. 617 (1982); Navedo v. Municipio de Barceloneta, 113 D.P.R. 421 (1982). En estos últimos dispusimos que para vindicar un despido ilegal de un empleado de carrera cobijado por el principio de mérito, lo que procede es la reposición en el puesto con la paga del sueldo dejado de percibir.

 Carrón Lamoutte v. Compañía de Turismo, supra, pág. 88. Véase, además, nuestras expresiones en Camacho Torres v. AAFET, 168 D.P.R. 66 (2006).

 Ley Núm. 201 de 22 de agosto de 2003 (4 L.P.R.A. sec. 24y).

 4 L.P.R.A. sec. 22k(g).

 López v. C.E.E., 161 D.P.R. 527 (2004).

 29 L.P.R.A. sec. 185a et seq.

 See. 4.5 de la Ley Núm. 170, supra, 3 L.P.R.A. sec. 2175.

 Mun. San Juan v. Plaza Las Américas, 169 D.P.R. 310 (2006). Véase, además, Hernández, Álvarez v. Centro Unido, 168 D.P.R. 592 (2006), citando a Otero v. Toyota, 163 D.P.R. 716 (2005).

 Mun. San Juan v. Plaza Las Américas, supra; Hernández, Álvarez v. Centro Unido, supra.

 íd.

 Mun de San Juan v. Plaza Las Américas, supra, pág. 324.

 íd. Véanse, además: T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70 (1999); Com. Seg. P.R. v. Antilles Ins. Co., 145 D.P.R. 226 (1998); Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020 (1992); Rivera v. A & C Development Corp., 144 D.P.R. 450 (1977).

 Mun. San Juan v. Plaza Las Américas, supra, pág. 324. Véanse: A.A.A. v. Unión Abo. A.A.A., 158 D.P.R. 273 (2002); Calderón v. Adm. Sistemas de Retiro, supra.

 Ley Núm. 12 de 24 de julio de 1985, según enmendada, 3 L.P.R.A sec. 1801 et seg.

 Este procedimiento fue aprobado por su Junta de Directores el 13 de mayo de 1997 y entró en vigor el 13 de junio de 1997. Apéndice del Certiorari, págs. 120-128.

 Apéndice del Certiorari, pág. 127.

 íd., págs. 127-128.

 Diccionario de la Lengua Española, 22da ed., Madrid, Ed. Espasa-Calpe, 2001, T. I, pág. 1609.

 Apéndice del Certiorari, pág. 415.

 Art. 1 de la Ley Núm. 12, supra, 3 L.P.R.A. sec. 1802.

 Art. 3.2 de la Ley Núm. 12, supra, 3 L.P.R.A. sec. 1802.